**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

NATURAL ALTERNATIVES )
INTERNATIONAL, INC. and COMPOUND )
SOLUTIONS, INC., )
                          )    C.A. No. _____
         Plaintiffs, )
                          )    **JURY TRIAL DEMANDED**
     v. )
                          )
DNP INTERNATIONAL CO., INC., )
                          )
         Defendant. )

## COMPLAINT

Plaintiffs Natural Alternatives International, Inc. ("NAI") and Compound Solutions, Inc.

("CSI") hereby bring this Complaint against Defendant DNP International Co., Inc. ("DNP") and

allege as follows:

## INTRODUCTION

1.      DNP has repeatedly attempted to unfairly compete with CSI's CarnoSyn®

branded beta-alanine product licensed by NAI.  Beta-alanine is a naturally occurring beta amino

acid produced in muscle tissue as a component of carnosine.  Plaintiffs' claims arise from

knowingly false and misleading statements made by DNP to improperly boost sales of its own

imported beta-alanine product from China.  On July 19, 2011, DNP issued a false and misleading

press release on the status of a dismissed case, *Natural Alternatives International, Inc. v. Vital*

*Pharmaceuticals, Inc. et al.*, Civil Action No. 09-626-GMS (D. Del.) (referred to as "related

case").  DNP has subsequently reissued and republished the press release by itself and in

combination with its sales efforts and it continues to appear on DNP's website.

2.      DNP suggested in its July 19 press release that a June 22, 2011 Order in the

related case granting all pending motions to dismiss, including NAI's claims against DNP, were

based on a finding that DNP did not infringe NAI's patents and that the patents were invalid. The press release also stated that the claims against DNP were dismissed because of the Court's May 31, 2011 claim construction in the related case.  In truth, the June 22 ruling was not based on an actual finding of non-infringement or invalidity.  Indeed, DNP's then-pending motions filed on January 24, 2011 against NAI and March 28, 2011 against CSI were not based on such arguments.  The related case was filed in August 2009 and DNP never pled any counterclaim or affirmative defense of non-infringement or invalidity of NAI's patents.  The Court's June 22 ruling had nothing to do with the earlier claim construction order construing some terms of some claims of some of NAI's beta-alanine U.S. patents.

3.      In a July 25, 2011 internet communication to customers and potential customers of beta-alanine, as well as competitors, DNP expressly misrepresented that "DNP is the #1 Beta Alanine importer in the World".   DNP is not the number one importer of beta-alanine.

4.      In 2008 and 2009, DNP purchased beta-alanine from a Japanese company.  DNP advertised in 2009, however, that it was the only source for Japanese beta-alanine in the United States and that it had an exclusive manufacturing facility. Both statements were false and misleading when made.

### PARTIES

5.      NAI is a Delaware corporation with its principal place of business in San Marcos, California.

6.      CSI is a California corporation with its principal place of business in Vista, California.

7.      DNP is a California corporation with its principal place of business located at 12802 Leffingwell Avenue, Bldg E, Santa Fe Springs, California, 90670 and with additional facilities in Bedford Park, Illinois, Edison, New Jersey and China.

## JURISDICTION AND VENUE

8.     The Court has subject matter jurisdiction over the underlying action pursuant to 28 U.S.C. §§ 1331, 1338, 1367, and 15 U.S.C. § 1121(a) because the action is a violation of the Lanham Act, 15 U.S.C. § 1051 *et seq.*, Delaware's Deceptive Trade Practices Act, 6 Del. Code § 2531, *et seq.*, Cal. Business and Professions Code §§ 17200, *et seq.*, and the common law.

9.     This Court has supplemental jurisdiction over the claims pursuant to 28 U.S.C. § 1367 because these claims are related to the underlying Lanham Act and the state law claims in this action and form part of the same case or controversy under Article III of the United States Constitution.

10.     The exercise of personal jurisdiction over DNP comports with the laws of the State of Delaware and the constitutional requirements of due process because DNP transacts business and/or offers to transact business within Delaware.

11.     Venue is proper in this District under 28 U.S.C. §§ 1391, 1400(b).

## FACTS

**A.     NAI and CSI**

12.     NAI is a leading formulator, manufacturer and marketer of nutritional supplements and provides strategic partnering services to its customers.  NAI is a publicly traded company.

13.     NAI's comprehensive partnership approach offers a wide range of innovative nutritional products and services to their clients including: scientific research, clinical studies, proprietary ingredients, customer-specific nutritional product formulation, product testing and evaluation, marketing management and support, packaging and delivery system design, regulatory review and international product registration assistance.

14.     NAI scientifically designs and customizes nutritional products based on the unique needs of individual clients.  New products and formulas are researched and tested prior to full-scale production.  NAI routinely produces pilot or sample runs of product formulation prototypes to ensure stability and/or efficacy and to determine ingredient interaction and prospective customer acceptance of the final product.  NAI also directs and participates in clinical research studies to establish consumer benefits and scientific efficacy supporting both product claims and marketing initiatives.

15.     NAI certifies that each raw material used meets or exceeds the requirements of the U.S. Food and Drug Administration (FDA), the U.S. Pharmacopoeia (USP) and the Therapeutic Goods Administration of Australia (TGA).  Raw materials are also tested to ensure that they are free of harmful pesticides and herbicides and are compliant with state and federal requirements for heavy metal concentration.  All of these tests are done by NAI to be in compliance with 21 CFR Part 111 requirements.

16.     NAI's marketing and product development experts are accomplished in the areas of market research, supplement design, manufacturing, packaging, distribution, international product registration and regulatory compliance. NAI provides in-house graphic design capabilities and works with clients to create label designs, brochures, videos and other promotional tools to appropriately market its products.  The combination of these components is part of a cohesive strategy designed to increase mass-market consciousness, boost brand awareness among the health-conscious consumers and facilitate expansion into new markets and channels of distribution.

17.     NAI's success in the formulation, development, manufacturing and marketing of specialized products is predicated on its dedication to research and development, technology,

science and state-of-the-art manufacturing. The comprehensive services NAI offers have established NAI as an innovator in the field of nutritional science.

18.     NAI was the exclusive licensee since April 28, 1997, and is now the owner by assignment of, U.S. Patent No. 6,426,361 ("the '361 patent"), issued on or about July 30, 2002, entitled "Methods and compositions for increasing the anaerobic working capacity in tissues."

19.     NAI was the exclusive licensee since April 28, 1997, and is now the owner by assignment of, U.S. Patent No. 6,172,098 ("the '098 patent"), issued on or about January 9, 2001, entitled "Methods and compositions for increasing the anaerobic working in tissues."

20.     NAI was the exclusive licensee since April 28, 1997, and is now the owner by assignment of, U.S. Patent No. 5,965,596 ("the '596 patent"), issued on or about October 12, 1999, entitled "Methods and compositions for increasing the anaerobic working in tissues."

21.     CSI is a global importer and supplier of raw ingredients to contract manufacturers, formulators and distributors in the nutritional supplement, food, beverage, cosmetic and pharmaceutical industries.  CSI imports and sells beta-alanine to companies that include the beta-alanine in products for the nutritional supplement market.

22.     CSI distributes beta-alanine in the United States.  CSI began selling beta-alanine in the United States in 2007.

23.     In March 2009, NAI licensed the '361, '098 and '596 patents to CSI.  NAI derives substantial revenue from royalty payments made by CSI, where the royalty payments are directly tied to CSI's sales of beta-alanine.  NAI and CSI compete with DNP and derive revenue from Carnosyn® Beta-alanine sales in the United States.

**B.      DNP**

24.      DNP is a global importer, supplier and distributor of raw ingredients to manufacturers in the nutritional supplement, food, beverage, cosmetic, animal nutrition and pharmaceutical industries.

25.      DNP supplies beta-alanine to nutritional supplement contract manufacturers, formulators and distributors in the United States. DNP imports beta-alanine into the United States.  Its products and services are offered to and may be purchased and/or used by citizens of Delaware. DNP owns, maintains and/or operates a website at www.dnpint.com, the content of which is incorporated herein by reference.

26.      DNP has sold and continues to sell beta-alanine to nutritional supplement manufacturers and customers in the United States in interstate commerce.

27.      In 2008 and 2009, DNP sold approximately $2,500,000 of beta-alanine.

28.      CSI and DNP both import beta-alanine and are direct competitors in the market for beta-alanine sales in the United States.  As alleged above, NAI directly profits from CSI's sales of beta-alanine.  NAI is a surrogate for a direct competitor with DNP because of the revenue it derives from CSI's licensed sales.

29.      On or about March 13, 2009, DNP contacted NAI to allegedly explore the possibility of licensing NAI's patents.  DNP's President David Ji sent an email to NAI representing that:  "I am owner of DNP. we [sic] have one Beta Alanine manufacture based in Japan which is the only origin registered and approved by FDA for human consumption."  DNP sought – but never obtained – a license from NAI.  NAI responded to DNP's email by advising DNP of its patents directed to beta-alanine and requesting additional information from DNP regarding its beta-alanine business.  DNP did not respond.

30.     As part of its business, DNP advertises, markets, and provides information to its customers and the market regarding beta-alanine and the benefits of using products containing beta-alanine.

**C.      DNP's July 2011 False and Misleading Statements**

31.     NAI filed the complaint in the related case on August 20, 2009, against DNP and Vital Pharmaceuticals, Inc. ("VPX") alleging infringement of the '361, '098, and '596 patents and other claims.

32.     On January 6, 2011, with leave of Court, NAI filed its First Amended Complaint in the related case.  On January 24, DNP filed a Motion to Dismiss NAI's claims against it.  On January 24, VPX answered the First Amended Complaint, asserted counterclaims against NAI, and filed a Third Party Complaint against CSI.  On March 3, CSI answered VPX's third-party claims and asserted cross claims against DNP. On March 28, 2011, DNP filed a motion to dismiss CSI's cross-claims against it.

33.     On May 31, the Court in the related case entered an Order construing the at-issue claim limitations of the patents-in-suit.

34.     On June 22, the Court granted certain dispositive motions filed by NAI, CSI and DNP without prejudice and with leave for NAI, CSI and VPX to amend their pleadings.  When the District Court dismissed NAI and CSI's claims against DNP on June 22, it did so on a preliminary motion to dismiss and originally provided NAI and CSI until July 6 to file an amended complaint.  That date was later extended by Court Order to July 20, August 3 and then August 10.

35.     On July 12, ignoring the Court's Order extending NAI and CSI's deadline to amend their pleadings, DNP's counsel, Enoch H. Liang of Lee Tran & Liang, wrote to NAI's counsel an email stating:

July 6 was the deadline for NAII and CSI to bring amended complaints against DNP. Neither NAII nor CSI did. Though an amended complaint has not been filed, DNP does not consider this case to be ended, and intends to pursue the following course of action:

1.      Seek its attorneys fees from Judge Sleet;

2.      Move for either ex parte or inter partes re-examination of NAII's patents before the USPTO; and

3.      Inform DNP's Beta-Alanine customers of the results of the Markman hearing.

Since the complaint against VPX is still active, DNP is informed that VPX and NAII/CSI are still engaged in ongoing settlement discussions. DNP remains interested in participating in these ongoing settlement discussions with NAII/CSI on the terms that were discussed in late June 2011.

Please let us know if NAII/CSI are interested in continuing settlement discussions. In the meantime, we will refrain from any of the aforementioned activities for a period of 14 days from the date of this email, i.e., **until July 26**, 2011. [Emphasis added.]

36.     DNP thus tried to improperly coerce NAI and CSI into entering into a settlement agreement with DNP.

37.     Despite the promise and representations of its counsel, on July 19, DNP issued a press release that stated the following:

DNP International Co, Inc., a leading global importer and raw ingredient supplier to the nutritional supplement, food, beverage, and pharmaceutical industries, announced that on June 22, 2011, Chief Judge Gregory M. Sleet of the United States District Court for the District of Delaware issued a ruling granting in its entirety DNP's motion for dismissal of all claims brought by Natural Alternatives International, Inc. and Compound Solutions, Inc. The lawsuit arose out of Natural Alternatives' claims that DNP infringed U.S. Patent Nos. 6,4262,361, 6,172,098, and 5,965,596 and that DNP violated various statutes for false advertisement. Compound Solutions also made claims in the lawsuit against DNP for false advertisement.

The court's action follows its claim construction order in DNP's favor issued on May 31, 2011.  All but one of Natural Alternatives' claim constructions for the three patents were rejected or found unnecessary by the Chief Judge Sleet.

"Many of Natural Alternatives' proposed constructions sought to avoid prior art and save their patents from invalidation by adding extraneous limitations to otherwise easily understood terms, by ignoring the full scope of the claim language, and by violating other basic principles of claim construction," said Steven R. Hansen, Senior Counsel at Lee, Tran & Liang, attorneys for DNP. For example, Natural Alternatives argued that the term "beta-alanine" as claimed in the patents could not be a component of a dipeptide, such as carnosine, despite contrary statements in the patents themselves.

In addition, during the claim construction hearing held on May 15, 2011, Natural Alternatives conceded that certain prior art would invalidate its patents if DNP's proposed constructions were adopted.  Following the rulings, the court dismissed all claims made by Natural Alternatives and Compound Solutions, while DNP will remain free to pursue its invalidity claims against Natural Alternatives.

In light of the dismissal, DNP has reassured its customers that it will continue to provide Beta Alanine in quality and quantity, based on its selective partnerships with manufacturers in China with a total monthly capacity of over 200MT (metric tons).  DNP announced that it is confident that the patents and asserted claims are invalid and would take all steps to vigorously defend itself and the interests of its customers against illegitimate patent claims.

"This decision vindicates our long-held position that DNP has not in any way infringed Natural Alternatives' patents related to Beta Alanine," said David Ji, president of DNP International.  "DNP has a strong tradition of innovation and respects the intellectual property of others.  We are proud of our position as a preeminent provider of raw ingredients to manufacturers worldwide."

38.     This press release, made by DNP and quoting its President (David Ji) and its counsel (Steven R. Hansen) was widely distributed and is materially false and misleading, for at least the following reasons:

a.      DNP's press release indicates that the District Court's dismissal of NAI's claims in the related case was based on a finding that DNP did not infringe NAI's patents-in-suit and that the patents were invalid.  The Court's June 22 ruling was not based on a finding of non-infringement or invalidity.  Indeed, DNP's motion was not based on such arguments.

b.      DNP's statement in its press release that the Court's June 22 ruling resulted from an early claim construction order is false.  The claim construction order had absolutely nothing to do with the dismissal.  There has never been a ruling that any claim of the three patents-in-suit is invalid.  Nor have VPX or DNP ever filed a motion with the Court asking that the patents be found to be not infringed or invalid.

c.      DNP's press release indicates that while claims against it were dismissed by the Court, it maintains its invalidity claims.  This is false.  DNP has no claims for invalidity pending before the Court.  To date, DNP has never filed an Answer in the related case, instead choosing to file multiple motions to dismiss.

d.      DNP's press release states that the Court's claim construction ruling applies to all of NAI's beta-alanine patents.  In fact, the ruling merely interpreted some terms in some claims of the patents-in-suit.  NAI holds other patents in the U.S. and worldwide related to beta-alanine.

e.      DNP's press release states that it can provide customers with a total monthly capacity of over 200 metric tons of beta-alanine (200,000 kilograms).  This statement is false and misleading.  DNP does not have the ability to supply that

large amount on a monthly basis. DNP has not imported anything close to that amount this year.

f.  The press release made the material omission that the June 22 dismissal was without prejudice, granted NAI and CSI leave to file amended pleadings against DNP, and that the time for those amended pleadings to be filed had not expired. DNP and its counsel of record received electronic court notifications that the Court had extended the date for parties to amend their pleadings.

39.  On or about July 20, 2011, DNP's press release was widely distributed in a blast email by DNP to the market that included customers and competitors of NAI and CSI, including customers that purchased or potentially would purchase beta-alanine from CSI.  On or about July 21, 2011, DNP's press release was published in the well-known trade publication Natural Product Insider under the title "Beta-Alanine Patent Suit Dismissed". http://www.naturalproductsinsider.com/news/2011/07/beta-alanine-patent-suit-dismissed.aspx. This article was also widely distributed on the internet on various websites and using social media, including Twitter.  This article also went to customers that purchase or potentially would purchase beta-alanine from CSI.  DNP also posted this article to its website and released its content in its industry newsletter entitled Ingredient Times.

40.  On or about July 25, 2011, DNP used the contents of the press release as part of another blast email to the market for beta-alanine promoting the sale of DNP's beta-alanine product, with the title "DNP Announces Dismissal of Natural Alternatives Patent Infringement Lawsuit", and provided a link to the July 20 press release.  It has also republished the press release in an August 15, 2011 blast email.

41.     The July 25 blast email also made the false and misleading statement that "DNP is the #1 Beta Alanine importer in the World".  DNP is not the number one beta-alanine importer. In fact, in 2010-11, CSI was the single largest importer of beta-alanine to the U.S.  Publicly-available import records for 2010 and 2011 clearly demonstrate that CSI imported more beta-alanine into the U.S. than DNP.

42.     Even though the July 20 press release suggests that DNP has been found not to infringe and that the patents-in-suit are invalid, the fine print in DNP's July 25 blast email states, "[e]nd users are solely responsible for INDEMNIFICATION and COMPLIANCE WITH APPLICABLE LAWS relating to patent and permissions as contained in DNP's terms and conditions."

43.     DNP's July 21, 2011 press release also quotes David Ji saying "DNP has a strong tradition of innovation and respects the intellectual property of others."  The statement is false and misleading in that DNP has been repeatedly sued for and admitted to infringing the U.S. patents of others, including without limitation the following:

a.      In *Lonza Ltd. v. DNP*, Civil Action No. 02-8113 (C.D. Cal.), DNP was accused of infringing several patents and trademarks.  DNP entered into a Consent Judgment and Order under which it admitted that it infringed those valid and enforceable patents and trademarks and was enjoined from future infringement.

b.      In *Sabinsa Corp. v. DNP*, Civil Action No. 06-5508 (D.N.J.), DNP agreed to a Final Consent Judgment in which it agreed that the patents-in-suit were valid and that DNP would "cease and desist" infringing activities.

c.      In *Nutrition 21 v. DNP*, Civil Action No. 99-1648 (S.D. Cal.), the court entered a preliminary injunction against DNP.  The Court's Order found that "Nutrition 21

has therefore demonstrated a reasonable likelihood that it will prevail at trial on the merits of its claim that the offer for sale and sale of chromium picolinate by DNP constitutes contributory infringement and inducement to commit infringement of the '988 patent."

d.    In *Cargill, Inc. v. Nantong Foreign Trade Medicines & Health Products Co.*, Civil Action No. 09-414 (D.N.J.), DNP was accused in a complaint of infringing a patent.  The case was dismissed without prejudice.

Thus, DNP's representation that it respects intellectual property rights is false and misleading.

**D.    DNP's 2009 False and Misleading Advertising and Promotions**

44.    DNP has made false and misleading statements and omits to state material facts as to the beta-alanine products of itself and others and the market for such products, including without limitation, the following:

b.    On or about May 1, 2009, DNP issued a press release and posted a copy on its website, which represented, in pertinent part, that:

DNP Tops U.S. Beta Alanine Imports in Quantity and Quality

SANTA FE SPRINGS, Calif. (May 1, 2009) As part of its exclusive power product line, sourced from the largest Japanese manufacturer in the world, DNP International continues to lead the nation in **importing more Beta Alanine than any other ingredient supplier**. This year, the company expects to source more than 5,000 metric tons of its food type Beta Alanine ingredient, which contains less heavy metal content than the standard industrial grade. Management believes that sourcing more quality Beta Alanine will be crucial in dictating an increased share of the bodybuilding market.

"We are proud to say we are the finest and only source for Japanese Beta Alanine in the U.S.," said David Ji, president of DNP International. "As a direct source to many power products like Beta Alanine, our goal is to solidify our ties in the bodybuilding industry by offering a quality ingredient with large quantities."

> Beta Alanine is a powerful, naturally occurring amino acid which can energize and improve workout capacities. Creatine Monohydrate combined with Beta Alanine can result in synergistic effects such [sic] lean mass gains, increased strength and weight loss. [Emphasis added.]

c.     DNP's May and July 2009 Ingredient Times expressly represented that DNP's beta-alanine is of "Japanese Origin" and that DNP had an "exclusive manufacturing facility":



45.     DNP has never had an "exclusive manufacturing facility" for beta-alanine in Japan.  Such representation was false and misleading.

46.     DNP was not the only source for Japanese beta-alanine in the United States in 2008 and 2009.  Such representation was false and misleading.

47.     Public records show that there were other sources for Japanese beta-alanine imported into the United States during the relevant time period.  For example, import records for beta-alanine in 2008 show the following:

a.     On January 6, 2008, DNP was the consignee of 18,400 kilograms of beta-alanine imported from Tokyo, Japan to the United States.

b.     On April 7, 2008, 5,515 kilograms of beta-alanine were imported from Tokyo, Japan to the United States; DNP was not listed as the consignee.

c.     On May 5, 2008, 18,400 kilograms of beta-alanine were imported from Yokohama, Japan to the United States; DNP was not listed as the consignee.

d.      On June 9, 2008, 18,400 kilograms of beta-alanine were imported from Yokohama, Japan to the United States; DNP was not listed as the consignee.

e.      On July 5, 2008, 36,800 kilograms of beta-alanine were imported from Yokohama, Japan to the United States; DNP was not listed as the consignee.

f.      On July 30, 2008, 5,115 kilograms of beta-alanine were imported from Tokyo, Japan to the United States; DNP was not listed as the consignee.

g.      On August 18, 2008, 5,116 kilograms of beta-alanine were imported from Tokyo, Japan to the United States; DNP was not listed as the consignee.

h.      On November 10, 2008, 3,676 kilograms of beta-alanine were imported from Tokyo, Japan to the United States; DNP was not listed as the consignee.

i.      On November 24, 2008, 4,605 kilograms of beta-alanine were imported from Tokyo, Japan to the United States; DNP was not listed as the consignee.

j.      On December 12, 2008, DNP was the consignee of 14,400 kilograms of beta-alanine imported from Yokohama, Japan to the United States.

k.      On December 15, 2008, DNP was the consignee of 14,400 kilograms of beta-alanine imported from Yokohama, Japan to the United States.

l.      On December 15, 2008, 5,526 kilograms of beta-alanine were imported from Tokyo, Japan to the United States; DNP was not listed as the consignee.

48.     Import records for 2009 show the following:

a.      On February 2, 2009, 5,514 kilograms of beta-alanine were imported from Tokyo, Japan to the United States; DNP was not listed as the consignee.

b.      On February 16, 2009, 14,400 kilograms of beta-alanine were imported from Yokohama, Japan to the United States where DNP was the consignee.

c.      On May 9, 2009, 14,400 kilograms of beta-alanine were imported from Yokohama, Japan to the United States; DNP was not listed as the consignee

d.      On May 25, 2009, 2,163 kilograms of beta-alanine were imported from Tokyo, Japan to the United States; DNP was not listed as the consignee.

e.      On October 26, 2009, 14,600 kilograms of beta-alanine were imported from Yokohama, Japan to the United States; DNP was not listed as the consignee.

f.      On December 6, 2009, DNP was the consignee for 11,200 kilograms of beta-alanine imported from Shanghai, China.

g.      On December 20, 2009, 28,800 kilograms of beta-alanine were imported from Yokohama, Japan to the United States; DNP was not listed as the consignee.

49.     DNP was not the purchaser of all of the beta-alanine imported to the United States from Japan in 2008 and 2009.

50.     Further, as alleged above, DNP's May and July 2009 Ingredient Times represented that it was the "only source" of Japanese-made beta-alanine and that its product was of "Japanese Origin".  DNP's subsequent advertising and promotional materials omitted to state the material fact that DNP was no longer selling Japanese beta-alanine.  Further, CSI began importing and selling Japanese beta-alanine in 2009.  DNP's subsequent advertising and promotional materials also omitted to state the material fact that DNP was not the "only" source for Japanese beta-alanine in the United States.

E.      **Results of DNP's Wrongful Conduct**

51.     DNP's press release and other public statements have disparaged and diminished the business of NAI and CSI and caused confusion in the market for beta-alanine in the United States.

52.     Both NAI and CSI have received and had to respond to inquiries from customers and others about DNP's false and misleading statements made by DNP in July 2011.  By way of example and not limitation, (a) a third-party wrote to CSI that DNP's public statement "looks authentic and your customers may take it true"; (b) a business partner of NAI saw DNP's statements and raised questions; and (c) a customer wrote to CSI referring to the "recent legal ruling negating the NAI/Compound Solutions claims against DNP" and included a link to DNP's July 2011 Ingredient Times statements.

53.     The false and misleading statements adversely affected the ability of NAI and CSI to compete and detracted from their reputation or goodwill in a fashion that benefitted DNP.  At the time DNP's statements were made, NAI was the exclusive licensee of beta-alanine patents and its Carnosyn® trademark and it derived patent and trademark licensing royalties from CSI tied to CSI's sales of Carnosyn® beta-alanine.  NAI and CSI's customers, distributors, suppliers and others were aware of DNP's statements when they were made and were influenced by them to buy beta-alanine from DNP  or CSI's other competitors rather than CSI.  DNP's statements had direct effects on NAI and CSI and the beta-alanine market in which they participate.

54.     DNP's deceptions were material and likely to influence purchasing decisions. Nutritional supplement manufacturers and other purchasers made decisions that were or may have been influenced by DNP's statements that it did not infringe NAI's invalid patents, that the June 22 ruling was based on the claim construction, that DNP was the number one beta-alanine importer, that it could supply 200 metric tons per month of product, and that DNP has a strong tradition of respecting intellectual property rights, and that DNP had an exclusive manufacturing facility and that it was the only source for Japanese beta-alanine.  They would also have been influenced by DNP's omissions and failure to correct its representations when DNP sold Chinese

beta-alanine and CSI sold Japanese beta-alanine.  DNP certainly made its statements to the market for the purpose of influencing purchasing decisions.  DNP spent significant resources promoting its false and misleading statements to the market.

55.     U.S. customers for beta-alanine products would read DNP's statements and would be likely confused and buy their beta-alanine from DNP.  CSI's customers were likely aware of the statements and influenced by them to buy DNP's beta-alanine instead of CSI's Carnosyn® beta-alanine.

56.     Sales of beta-alanine by DNP made as a result of its false and misleading statements caused CSI to lose sales and NAI to lose royalty payments, in an amount to be proven at trial.

57.     Since DNP made its July 20, 2011 press release, it has imported higher quantities of beta-alanine.

58.     The documents referred to herein are incorporated by reference.

### COUNT I
### (Lanham Act § 43(a))

59.     The foregoing allegations of this complaint are incorporated by reference.

60.     DNP's products are used, sold, and/or offered for sale in interstate and foreign commerce.

61.     In connection with its goods or services, DNP has used one or more words, terms, names, symbols, or devices, alone or in combination, as well as false designations of origin, false or misleading descriptions or representations of fact, which are in commercial advertising or promotion (including without limitation its website, promotional materials, emails and in trade publications), DNP misrepresents the nature, characteristics, qualities, or geographic origin of its or plaintiffs' goods, services, or commercial activities.

62.     DNP knowingly and willfully misrepresented to the public, *inter alia*, the facts alleged above.

63.     DNP's commercial messages and statements are either literally false or literally true but ambiguous and have the tendency to deceive the market, the public, consumers, potential consumers and competitors of NAI and CSI.   Moreover, DNP's advertising claims were unsubstantiated and false.

64.     DNP's misrepresentations were material and made in bad faith for the purpose of deceiving the market, the public, consumers, potential consumers and competitors of NAI and CSI and harming its competition, including plaintiffs.

65.     The misrepresentations deceive or are likely to deceive the market, the public, consumers, potential consumers and competitors of plaintiffs' and DNP's products.  Further, the misrepresentations are likely to influence the purchasing decisions of others and have caused injury or are likely to do so.

66.     By reason of DNP's statements and conduct, DNP has willfully violated section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and plaintiffs have suffered, and will continue to suffer damage to their business, reputation, and good will and have lost sales and profits that plaintiffs would have made but for DNP's acts.

67.     Plaintiffs have been irreparably harmed by DNP's acts in violation of the Lanham Act and have suffered damages in an amount to be determined at trial.

## COUNT II
### (Delaware Deceptive Trade Practices Act)

68.     The foregoing allegations of this complaint are incorporated by reference.

69.     DNP has knowingly made multiple and continuing false and misleading statements and has omitted statements of material fact to the public.

70.     Such statements have been made and are continuing to be made in the State of Delaware.

71.     DNP's misrepresentations were made in bad faith for the purpose of deceiving the market, the public, consumers, potential consumers and competitors and harming its competition.

72.     DNP has disparaged the business of NAI and CSI.

73.     DNP has engaged in other conduct that creates a likelihood of confusion or of misunderstanding regarding the goods or services supplied by plaintiffs.

74.     DNP has violated the Delaware Deceptive Trade Practices Act, 6 Del. Code § 2531, *et seq.*, and plaintiffs have suffered, and will continue to suffer, damage to their business, reputation, and goodwill.

75.     Plaintiffs have suffered and will continue to suffer irreparable injury and DNP should be preliminarily and permanently enjoined from further unlawful conduct.

**COUNT III**
**(California Unfair Competition Law)**

76.     The foregoing allegations of this complaint are incorporated by reference.

77.     In connection with its July 2011 misrepresentations alleged above, DNP has knowingly made false and misleading statements and has omitted statements of material fact to the public in violation of section 43(a) of the Lanham Act and section 5 of the Federal Trade Commission Act.

78.     At all relevant times, California's Unfair Competition Law ("UCL"), Business and Professions Code § 17200, *et seq.*, was in full force and effect and applicable to DNP, a California corporation.

79.     DNP violated the UCL by engaging in unlawful, unfair and/or fraudulent business acts or practices by engaging in the conduct alleged above.

80.     NAI and CSI have been personally aggrieved by DNP's unlawful business acts and practices as alleged herein, including but not necessarily limited to the loss of money or property.

81.     DNP should be preliminarily and permanently enjoined from further violation of the law.

82.     As a result of the UCL violation, DNP should be ordered to disgorge the profits they received as the result of their conduct, in an amount to be proven at trial.

## COUNT IV
### (California False Advertising Law)

83.     The foregoing allegations of this complaint are incorporated by reference.

84.     In connection with its July 2011 misrepresentations alleged above, DNP has made statements in its advertising that are false and misleading.  DNP knew or by the exercise of reasonable care should have known that the statements were false and misleading.

85.     At all relevant times, California's False Advertising Law, Business and Professions Code § 17500, *et seq.*, was in full force and effect and applicable to DNP, a California corporation.

86.     DNP violated the False Advertising Law by engaging in the conduct alleged above.

87.     Members of the public were or are likely to be deceived by DNP's false and misleading statements.

88.     DNP should be preliminarily and permanently enjoined from making further false and misleading statements and should make corrective disclosures.  Without such injunctive relief, the unlawful conduct by DNP is likely to continue, particularly since it has repeatedly made the same false and misleading statements.

## COUNT V
### (Prima Facie Tort)

89.     The foregoing allegations of the complaint are incorporated by reference.

90.     DNP has intentionally inflicted harm on NAI and CSI, resulting in damage, without excuse or justification, by an act or series of acts which would otherwise be lawful and which acts do not fall within the categories of traditional tort.

91.     As a direct and proximate result of the foregoing, plaintiffs have been injured in an amount to be determined at trial in excess of $75,000.

## REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court enter judgment against DNP and that the following relief be granted:

a.     judgment that DNP has violated the Lanham Act section 43(a);

b.     treble damages and statutory damages;

c.     a preliminary and permanent injunction against continued violations of the Lanham Act, the Delaware Deceptive Trade Practices Act and California's UCL and False Advertising Law, including enjoining further false and misleading statements and corrective disclosures;

d.     judgment that DNP has violated Delaware and California's law of deceptive trade practices;

e.     damages for past violations of the Delaware Deceptive Trade Practices Act;

f.     disgorgement of profit under the UCL;

g.     damages for prima facie tort;

h.     punitive damages allowed by law;

i.    attorneys' fees as allowed by law, including without limitation, 15 U.S.C.

§ 1117(a);

j.    costs pursuant to Fed. R. Civ. P. 54(d) or otherwise provided by law; and

k.    such other relief as the Court deems just and appropriate under the circumstances.

## **JURY DEMAND**

Plaintiffs hereby demand a jury trial on all issues so triable.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Kevin M. Bell                                   By:  */s/ Richard L. Horwitz*
Scott Chambers, Ph.D.                              Richard L. Horwitz (#2246)
Lacy Kolo, Ph.D.                                   David E. Moore (#3983)
PATTON BOGGS, LLP                                  Hercules Plaza 6th Floor
8484 Westpark Drive, Ninth Floor                   1313 N. Market Street
McLean, Virginia 22102                             Wilmington, DE  19899
Tel:  (703) 744-8000                               Tel:  (302) 984-6000
                                                   rhorwitz@potteranderson.com
                                                   dmoore@potteranderson.com
Richard J. Oparil
PATTON BOGGS LLP
2550 M Street, NW                               *Attorneys for Plaintiffs Natural Alternatives*
Washington, DC  20037                           *International, Inc. and Compound Solutions, Inc.*
Tel:  (202) 457-6000

Caroline Cook Maxwell
PATTON BOGGS LLP
2000 McKinney Avenue
Suite 1700
Dallas, TX 75201
Tel:  (214) 758-1500

Dated:  September 8, 2011
1026768 / 34341