## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NATURAL ALTERNATIVES INTERNATIONAL, INC. and COMPOUND SOLUTIONS, INC., | ) ) ) | |
| | ) | C.A. No.  11-788-GMS (Cons.) |
| Plaintiffs, | ) ) | |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| DNP INTERNATIONAL CO., INC., | ) ) | |
| Defendant. | ) ) | |

## PLAINTIFFS' OPENING BRIEF IN SUPPORT OF CLAIM CONSTRUCTION

OF COUNSEL:

Richard J. Oparil
Scott A.M. Chambers, Ph.D.
Kevin M. Bell
Lacy Kolo, Ph.D.
PATTON BOGGS LLP
2550 M Street, NW
Washington, DC 20037
Tel:  (202) 457-6000

Caroline Cook Maxwell
PATTON BOGGS LLP
2000 McKinney Avenue
Suite 1700
Dallas, TX 75201
Tel:  (214) 758-1500

Dated:  February 7, 2014
1138725 / 34341

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
Tel:  (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Plaintiffs Natural Alternatives
International, Inc. and Compound Solutions, Inc.*

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................2

I.      NAI/CSI ....................................................................................................................2

II.     DNP ..........................................................................................................................2

III.    The Patents-In-Suit .................................................................................................2

        A.      The Three "Old Patents" .............................................................................2

        B.      The '381 Patent ...........................................................................................4

DISPUTED TERMS FROM THE '381 PATENT ..........................................................5

I.      Human Dietary Supplement ...................................................................................5

        A.      NAI's Proposed Construction .....................................................................5

                1.      Not Only Is "Human Dietary Supplement" A Limitation In The
                        Body Of Claim 13 And The Preamble Of Claim 1 That Should Be
                        Construed By The Court, The Intrinsic Evidence Overwhelmingly
                        Supports NAI's Proposed Construction....................................................5

        B.      DNP Has Not Proposed Any Construction Of "Human Dietary
                Supplement." ..............................................................................................15

II.     Effective in Delaying the Onset of Fatigue in a Human.................................16

        A.      NAI's Proposed Construction...................................................................16

        B.      DNP Has Not Proposed Any Construction For The Term "Effective In
                Delaying The Onset Of Fatigue In A Human." ........................................19

CONCLUSION...................................................................................................................19

# TABLE OF AUTHORITIES

CASES                                                                                                    PAGE(S)

*Abbott Labs. v. Sandoz, Inc.*,
    566 F.3d 1282 (Fed. Cir. 2009)......................................................................................12

*Biosig Instruments, Inc. v. Nautilus, Inc.*,
    715 F.3d 891 (Fed. Cir. 2013), *cert. granted*, 187 L. Ed. 2d 702 (2014)..............................16

*Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*,
    334 F.3d 1294 (Fed. Cir. 2003).....................................................................................17

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
    289 F.3d 801 (Fed. Cir. 2002)............................................................................ 6, 10, 11

*Computer Docking Station Corp. v. Dell, Inc.*,
    519 F.3d 1366 (Fed. Cir. 2008)................................................................................6, 12

*Digital Biometrics v. Indentix, Inc.*,
    149 F.3d 1335 (Fed. Cir. 1998).....................................................................................12

*Eagle Comtronics, Inc. v. Arrow Commc'n Labs., Inc.*,
    305 F.3d 1303 (Fed. Cir. 2002).....................................................................................12

*Exxon Research & Eng'g Co. v. United States*,
    265 F.3d 1371 (Fed. Cir. 2001).....................................................................................16

*Guttman v. Kopykake Enterprises, Inc.*,
    302 F.3d 1352 (Fed. Cir. 2002)................................................................................6, 12

*Hockerson-Halberstadt, Inc. v. Converse Inc.*,
    183 F.3d 1369 (Fed. Cir. 1999).....................................................................................17

*Markman v. Westview Instruments, Inc.*,
    517 U.S. 370 (1996) .....................................................................................................15

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996)..............................................6, 17

*Metabolite Labs., Inc. v. Corp. of Am. Holdings*,
    370 F.3d 1354 (Fed. Cir. 2004).....................................................................................10

*Omega Eng'g, Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003).....................................................................................12

*On Demand Mach. Corp. v. Ingram Indus.*,
    442 F.3d 1331 (Fed. Cir. 2006).......................................................................................6

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005)..........................................................................................6, 17

*Rheox, Inc. v. Entact, Inc.*,
  276 F.3d 1319 (Fed. Cir. 2002)............................................................................................12

*Spectrum Int'l. Inc. v. Sterilite Corp.*,
  164 F.3d 1372 (Fed. Cir. 1998)........................................................................................7, 12

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996)...................................................................................6, 7, 12, 17

Plaintiff, Natural Alternatives International Inc. ("NAI"), respectfully submits this Memorandum in Support of its Proposed Claim Construction of U.S. Patent No. 5,965,596 ("the '596 patent"), U.S. Patent No. 6,172,098 ("the '098 patent"), U.S. Patent No. 6,426,361 ("the '361 patent") and U.S. Patent No. 8,067,381 ("the '381 patent") (collectively "the patents-in-suit").[1]

## INTRODUCTION

The invention of the patents-in-suit relates to the use of the amino acid beta-alanine as a dietary supplement that can increase the anaerobic working capacity of muscles and delay the onset of muscular fatigue, *i.e.*, dietary supplements containing the amino acid beta-alanine help athletes train, or perform for longer periods of time without feeling tired. Dependent claims to the inventive dietary supplements specifically include other amino acids or compounds, such as creatine, carbohydrates and insulin stimulating agents.

As a result of the Stipulation and Order regarding the '596, '098 and '361 patents (D.I. 47), there are only two terms from the '381 patent that the Court is being asked to construe – "human dietary supplement" and "effective in delaying the onset of fatigue in a human." The claim interpretation issues here are straightforward as they rely on the intrinsic evidence and follow well-settled precedent from the Supreme Court and the Federal Circuit. Defendant DNP International Co., Inc. ("DNP") does not offer any construction for the disputed terms. Rather, DNP attempts to avoid the Court's claim construction process and schedule to argue invalidity by alleging that the claims are indefinite. Because DNP does not offer any construction for the disputed terms, the Court should adopt NAI's proposed construction.

---

[1]     Plaintiff NAI is the owner of the patents-in-suit. Plaintiff, Compound Solutions Inc., ("CSI") is a licensee of NAI and has no other interest in the patents-in-suit.

# BACKGROUND

## I.     NAI/CSI

NAI was established in 1980. NAI is the owner through assignment of the patents-in-suit. NAI scientifically designs and customizes nutritional products based on the unique needs of individual clients. NAI also directs and participates in clinical research studies to establish consumer benefits and scientific efficacy supporting both product claims and marketing initiatives. NAI's success in the formulation, development, manufacturing and marketing of specialized products is predicated on its dedication to research and development, technology, science and state-of-the-art manufacturing. The comprehensive services NAI offers have established NAI as an innovator in the field of nutritional science. As such, NAI recognized the importance of the research being conducted by the inventors of the patents-in-suit and collaborated with them at an early stage in the prosecution of the patents-in-suit, through an exclusive license agreement. Subsequently, NAI became the owner of the patents-in-suit by assignment from the inventors.

CSI is a licensee of the patents-in-suit. CSI pays royalties to NAI based on its sale of beta-alanine to dietary supplement manufacturers that use the beta-alanine in dietary supplements covered by the patents-in-suit.

## II.    DNP

DNP imports significant amounts of beta-alanine, which it then markets and distributes to manufacturers for use in dietary supplements. It also provides information regarding the benefits of using products containing beta-alanine.

## III.   THE PATENTS-IN-SUIT

### A.     The Three "Old Patents"

There are three "old patents" assigned to NAI that are at issue in this case. These are:

- The '596 patent issued on October 12, 1999, entitled "Methods and compositions for increasing the anaerobic working in tissues." JX 1.[2] The named inventors are Roger Harris and Mark Dunnett. The examiner at the Patent Office was Raymond Henley, III. JX 1 at 1.

- The '098 patent issued on January 9, 2001, entitled "Methods and compositions for increasing the anaerobic working in tissues." JX 2. The named inventors are Roger Harris and Mark Dunnett. The examiner at the Patent Office was Raymond Henley, III. JX 2 at 1.

- The '361 patent issued on July 30, 2002, entitled "Methods and compositions for increasing the anaerobic working capacity in tissues." JX 3. The named inventors are Roger Harris and Mark Dunnett. The examiner at the Patent Office was Raymond Henley, III. JX 3 at 1.

In *Natural Alternatives International, Inc. v. Vital Pharmaceuticals, Inc., et al.*, C.A. No. 09-626-GMS ("VPX Litigation"), NAI asserted the '596, '098 and '361 patents against Vital Pharmaceuticals, Inc. ("VPX") and DNP. During the VPX litigation, it was alleged that certain prior art rendered the '596, '098 and '361 patents invalid and certain arguments were set forth by VPX regarding the validity of the '596, '098 and '361 patents in discovery responses. JX 9. The Court also construed certain disputed terms of the '596, '098 and '361 patents. (*See* Claim Construction Order, filed here at D.I. 47 Ex. 1).[3]

---

[2]     "JX" refers to the exhibits to the Joint Appendix of Extrinsic Evidence which will be filed on the same day as the Answering Brief.

[3]     On June 22, 2011, the Court granted certain pending motions to dismiss. (D.I. 127). On August 8, 2011, plaintiffs and defendant VPX voluntarily dismissed certain claims and counterclaims. (D.I. 132). On August 3, 2011, plaintiffs filed a Second Amended Complaint against DNP (D.I. 131), which plaintiffs voluntarily dismissed without prejudice on September 8, 2011. (D.I. 137).

As set forth in the Stipulation and Order filed in this case, the parties agreed that the term "mixture" used in the three old patents is "a composition, physical combination, or blend of substances that are not chemically bonded to one another." (D.I. 46 at 6; D.I. 47 ¶ 3). To conserve the resources of the Court and the parties, the parties also stipulated that they would not ask the Court to re-construe other disputed claim terms from the Claim Construction Order, but that the issue would be preserved for appellate review. (D.I. 47). The parties' proposed constructions and citations to intrinsic evidence are set forth in the Joint Claim Construction Chart. (D.I. 46). For the record, copies of that evidence are at JX 1-3, 10-16.

**B.    The '381 Patent**

The '381 patent issued on November 29, 2011, from an application that was filed August 22, 2011 and is entitled "Methods and compositions for increasing the anaerobic working capacity in tissues." JX 4. The named inventors are Roger Harris and Mark Dunnett. The examiner at the Patent Office was Raymond Henley, III. JX 4 at 1.

The application that issued as the '381 patent was filed after the Court issued its Claim Construction Order in the VPX litigation. At the time of filing the application that became the '381 patent, NAI submitted a preliminary amendment addressing the errors it perceived in the Court's Claim Construction Order and argued that the claims were valid over the prior art and allegations set forth in the discovery responses from VPX. JX 5. NAI also provided a copy of the Court's Claim Construction Order and the discovery responses by VPX to the Examiner at the U.S. Patent and Trademark Office ("USPTO"). JX 6. The Examiner considered these documents during the prosecution of the application that issued as the '381 patent. JX 7.

NAI has asserted that DNP infringes claims 1, 8, 9, 11 and 13 of the '381 patent. Independent claim 1 reads:

A human dietary supplement comprising at least one of: an amino acid wherein said amino acid is beta-alanine that is not part of a dipeptide, polypeptide or oligopeptide; an ester of beta-alanine that is not part of a dipeptide, polypeptide or oligopeptide; or an amide of beta-alanine that is not part of a dipeptide, polypeptide or oligopeptide.

JX 4. Claim 8 depends from claim 1 and further requires the presence of creatine as part of the human dietary supplement. Claim 9 also depends from claim 1 and requires the presence of creatine monohydrate in the human dietary supplement. Claim 11 depends from claim 1 and requires the human dietary supplement be in solid form. Claim 13 includes a functional limitation, providing: "The human dietary supplement of claim 1, wherein the human dietary supplement is effective in delaying the onset of fatigue in a human."

## DISPUTED TERMS FROM THE '381 PATENT

## I.   HUMAN DIETARY SUPPLEMENT

| Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|------|-----------------------------------|-----------------------------------|
| human dietary supplement ('381 patent claims 1, 8, 9, 11, 13) | "an addition to the human diet, ingested as a pill, capsule, tablet, powder or liquid, which is not a natural or conventional food, meat or food flavoring or extract, or pharmaceutical product and that increases the function of tissues when consumed over a period of time." | The term should not be construed because it is not a limitation.<br><br>However, if the term is construed to be a limitation the claims are rendered indefinite. |

### A.   NAI's Proposed Construction

**1.   Not Only Is "Human Dietary Supplement" A Limitation In The Body Of Claim 13 And The Preamble Of Claim 1 That Should Be Construed By The Court, The Intrinsic Evidence Overwhelmingly Supports NAI's Proposed Construction.**

The term "human dietary supplement" is a claim limitation and it means "an addition to the human diet, ingested as a pill, capsule, tablet, powder or liquid, which is not a natural or

conventional food, meat or food flavoring or extract, or pharmaceutical product and that

increases the function of tissues when consumed over a period of time." The term "human

dietary supplement" appears in the **preamble** of all the claims in the '381 patent and in the **body**

of claims 13 and 14 of the '381 patent. JX 4 at col. 21-22. The intrinsic evidence – the claim

language, specification and prosecution history – supports NAI's construction. *Markman v.*

*Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996);

*Guttman v. Kopykake Enterprises, Inc.*, 302 F.3d 1352, 1362 (Fed. Cir. 2002); *Phillips v. AWH*

*Corp.*, 415 F.3d 1303, 1312, 1315-17 (Fed. Cir. 2005).

DNP's suggestion that the Court does not need to construe the term because it is not a

limitation is clearly wrong. Claims 13 and 14 have the term "human dietary supplement" in the

**body** of the claim and rely upon the presence of the term in the preamble of all the claims for

antecedent basis. *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.,* 289 F.3d 801, 808 (Fed. Cir.

2002). To define claim scope, a court initially looks to the words of the claims themselves.

*Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996); *see also Phillips*, 415

F.3d at 1312-13. Additionally, the term is a limitation and requires construction because it is a

necessary and defining aspect of the invention, which the specification and prosecution history

makes clear.[4] The words of the claims should be considered in conjunction with the

specification, of which they are a part, in determining the proper meaning of terms. *Markman*, 52

F.3d at 978-79; *Vitronics*, 90 F.3d at 1582; *Phillips*, 415 F.3d at 1314. The prosecution history

---

[4]      *See, e.g., id.* ("when reciting additional structure or steps underscored as important by the
specification, the preamble may operate as a claim limitation."); *On Demand Mach. Corp. v.
Ingram Indus.,* 442 F.3d 1331, 1343 (Fed. Cir. 2006) ("In considering whether a preamble limits
a claim, the preamble is analyzed to ascertain whether it states a necessary and defining aspect of
the invention, or is simply an introduction to the general field of the claim."); *Computer Docking
Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1375 (Fed. Cir. 2008) (explaining that even where the
limitation does not appear in the body of the claims, the written description and statements made
during prosecution can require a term in the preamble to limit a claim).

can demonstrate how the inventor understood the invention and show whether the inventor narrowed the claim scope by limiting the invention during prosecution. *Vitronics*, 90 F.3d at 1582-83; *see also Spectrum Int'l. Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1378 (Fed. Cir. 1998) ("Explicit statements made by a patent applicant during prosecution to distinguish a claimed invention over prior art may serve to narrow the scope of the claim.").

Here, the specification clearly underscores the importance of human dietary supplements and demonstrates that the term is a necessary and defining aspect of the invention. The patents-in-suit disclose the importance of the supplements to compensate for the reduced levels of nutrients in the diet. JX 4 AT col. 1, ll. 40-47; JX 3 AT col. 1, ll. 18-25[5] ("Natural food supplements are typically designed to compensate for reduced levels of nutrients in the modern human and animal diet. In particular, useful supplements increase the function of tissues when consumed. It can be particularly important to supplement the diets of particular classes of animals whose the normal diet may be deficient in nutrients available only from meat and animal produce (*e.g.*, human vegetarians and other animals consume an herbivorous diet).") This demonstrates that the applicants intended that the supplements of the invention were something other than a conventional food because they were intended to compensate for reduced levels of nutrients in the diet, *i.e.*, nutrients available from conventional food stuffs and that this was important to the overall invention. Additionally, conventional food stuffs, such as meat and animal produce, cannot be used to supplement the diets of particular classes of animals that do not eat these conventional food stuffs. For example, conventional food stuffs like meat and animal products cannot be used to supplement the diets of vegetarians. This also shows that the

---

[5]       Citations to JX 3 are intended to show that the disclosure is in the '596, '098 and '361 patents as these patents share a common specification as they are continuations. JX. 4 contains additional disclosure as one of the applications in the priority chain is a continuation-in-part when compared to the '596, '098 and '361 patents.

applicants understood the importance of the form that the beta-alanine and/or L-histidine take for the supplements of the invention to be useful.

Such forms – well understood by one of skill in the art – would be a pill, capsule, tablet, powder or liquid. This is evident from the written description that states "[t]he ingestible formulation can be a drink, a gel, a food, or a tablet." JX 4 at col. 3, ll. 44-45. The written description further states "[t]he compositions of the invention can be used for the preparation of a dietary supplement (including, *e.g.*, drinks, gels, foods) or pharmaceutical compositions for humans or animals." JX 4 at col. 5, ll. 14-17. It is clear, therefore, that the written description of the patents-in-suit provide support for the "human dietary supplement" to be in the form of a pill, capsule, tablet, powder or liquid and that the dietary supplement is distinct from a pharmaceutical composition.

The written description also underlines the importance that the supplements of the invention be something other than a conventional food because conventional foods will not contain sufficient quantities of the beta-alanine and/or L-histidine. For example, the specification states that "[t]he compositions and methods can contribute to correcting the loss of beta-alanine, L-histidine, or creatine due to degradation or leaching of these constituents during cooking or processing. The compositions and methods can also contribute to correcting the absence of these components from a vegetarian diet." JX 4 AT col. 6, l. 66-col. 7, l. 4; JX 3 AT col. 3, ll. 54-59. Therefore, the human dietary supplements of the patents-in-suit cannot be conventional food because the processing of conventional food, for example, by cooking, removes the beta-alanine and/or L-histidine from the food.

Additionally, the written description of the patents-in-suit distinguishes the human dietary supplements of the invention from other compositions. Specifically, the written

description states "[i]n alternative aspects, the composition is a pharmaceutical composition, a dietary supplement, or a sports drink." JX 4 at col. 3, ll. 21-25. The written description further states "[t]he compositions of the invention can be used for the preparation of a dietary supplement (including, *e.g.*, drinks, gels, foods) or pharmaceutical compositions for humans or animals." JX 4 at col. 5, ll. 14-17. It is clear, therefore, that the inventors considered, and the written description explains, that dietary supplements and pharmaceutical compositions are not the same and that the term "human dietary supplement" does not include pharmaceutical compositions or products.

Additionally, the "human dietary supplement" of the '381 patent must increase the function of tissues when consumed. Specifically, the specification states, "[n]atural food supplements are typically designed to compensate for reduced levels of nutrients in the modern human and animal diet. In particular, useful **supplements increase the function of tissues** when consumed. It can be particularly important to supplement the diets of particular classes of animals whose the normal diet may be deficient in nutrients available only from meat and animal produce (*e.g.*, human vegetarians and other animals consume an herbivorous diet)." JX 4 AT col. 1, ll. 40-47; JX 3 at col. 1, ll. 18-25 (emphasis added). Furthermore, Example IV demonstrates that consumption of the "human dietary supplements" of the invention increases the function of tissues. Specifically, the maximal voluntary contractile force of the knee extensors increased after consumption of the "human dietary supplements" for a period of 14 days. JX 4 at col. 17, l. 41-col. 18, l. 11; JX 3 at col. 14, l. 38-col. 15, l. 9.

The consumption of the dietary supplements for a prolonged period of time is also supported throughout the specification, not just Example IV. For example, the written description states "[t]he composition can be given over a period of at least 3, 4, 5, 6, … 14 or 15

or more days. The composition can be given over a period of at least about 3 days to about two,

three, four or more weeks." JX 4 at col. 3, l. 67-col. 4, l. 3. The written description also states

"the amount of a composition of the invention administered is increased daily. The amount of the

composition of the invention administered can be increased weekly. The composition can be

administered in treatment periods that last for at least about four weeks." JX 4 AT col. 4, ll. 30-

34. Additionally, the inventors disclosed experiments in which the supplements were given to the

subjects for a prolonged period of time.[6] The written description, therefore, provides ample

support for the inventors' intention that the dietary supplements be given over a prolonged period

of time.

The applicants also relied upon the preamble term during prosecution to distinguish the

claimed subject matter over the prior art and the Examiner understood this and used it as a

limitation in his examination of the claimed subject matter. *See e.g., Metabolite Labs., Inc. v.*

*Corp. of Am. Holdings*, 370 F.3d 1354, 1358-62 (Fed. Cir. 2004) (explaining a "preamble may

provide context for claim construction, particularly, where … that preamble's statement of

intended use forms the basis for distinguishing the prior art in the patent's prosecution

history."); *Catalina*, 289 F.3d at 808 ("clear reliance on the preamble during prosecution to

---

[6]      *See, e.g.,* JX 4 at col. 10, ll. 38-39; JX 3 at col. 6, ll. 40-41 ("The effect of
supplementation of a normal diet with multiple daily doses of beta-alanine."); JX 4 at col. 10, ll.
61-62; JX 3 at col. 6, ll. 64-65 ("Dietary supplementation was begun on day 1 of the protocol and
discontinued on day 30."); JX 4 at col. 15, ll. 47-51; JX 3 at col. 11, ll. 63-67 ("The effect of
administration of three doses of 10 milligrams per kilogram body weight of beta-alanine per day
(*i.e.*, administered in the morning, noon, and at night) for seven days on the plasma concentration
profiles of beta-alanine and taurine were investigated."); JX 4 at col. 10, ll. 56-61; JX 3 at col.
12, ll. 7-11 ("Test subjects received three doses per day of 10 milligrams per kilogram body
weight of beta-alanine for eight days. In two subjects, this was followed by a further 7 days (days
9-15) when three doses of 20 milligrams per kilogram body weight per day were given."); JX 4
at col. 16, ll. 30-35; JX 3 at col. 12, ll. 60-65 ("The effect of administration of three doses of 40
milligrams per kilogram body weight of beta-alanine per day (*i.e.*, administered in the morning,
noon, and at night) for 2 weeks on the carnosine content of muscle and isometric endurance at
66% of maximal voluntary contraction force was investigated.").

distinguish the claimed invention from the prior art transforms the preamble into a claim limitation because such reliance indicates use of the preamble to define, in part, the claimed invention."). Here, both the applicants and the Examiner clearly relied upon the term to distinguish the claimed invention over the prior art and the term, therefore, is a limitation.

The preliminary amendment that was filed with the application that issued as the '381 patent clearly states what the inventors intended to be understood by the term "human dietary supplement." The preliminary amendment unambiguously states **"[b]y human dietary supplements the applicants mean an addition to the human diet in a pill, capsule, tablet, powder or liquid form, which is not a natural or conventional food, and which effectively increases the function of tissues when consumed."** JX 5 at 5 (emphasis added). To support this definition, the applicants cited the portions of the written description that are discussed above. *Id*. The preliminary amendment also made clear "the term 'human dietary supplement,' as claimed, **does not encompass, and does not mean, a natural or conventional food, such as chicken or chicken broth**, for example." *Id*. (emphasis added). The preliminary amendment also stated that the claimed subject matter, *i.e.*, human dietary supplements containing the individual amino acid beta-alanine, is not encompassed by any alleged prior art and/or arguments set forth in discovery responses served during the VPX litigation. *Id*. (referring to JX 9). Specifically, the preliminary amendment stated the claims do not encompass meat, meat extract supplements and predigested meat/protein supplements and that to the extent any of the compositions alleged as prior art contain the individual amino acid beta-alanine "applicants respectfully submit that the definition of human dietary supplement set forth above does not encompass compositions such as those set forth by the Defendant in the Interrogatory Response." *Id*. at 6. It is clear, therefore, that the term "human dietary supplement" was relied upon during prosecution to distinguish the claimed

subject matter over the prior art and so is a proper claim limitation. Furthermore, it is clear that a specific definition was set forth during prosecution and that this definition was supported by the specification. Here, the inventors choose to be their own lexicographer and provided this clear definition of the term in the prosecution history of the '381 patent.[7] Their definition should be given effect.

At the time of filing the preliminary amendment, the applicants also filed an Information Disclosure Statement with the USPTO, which disclosed the Court's Claim Construction Order and defendant's discovery responses from the VPX litigation. JX 6 at 9; JX 9. The prosecution history of the '381 patent demonstrates that the Examiner considered these two documents during the pendency of the application. JX 7 at 9. Subsequently, the Examiner allowed the application and in his Notice of Allowance found that "[t]his application contains claims directed to beta-alanine compositions, which is not part of a dipeptide, polypeptide or oligopeptide and **is**

---

[7]      Words in a claim are generally given their ordinary and customary meaning unless a patentee chooses to be his own lexicographer and provides a special definition of the term in the patent specification or prosecution history. *Guttman*, 302 F.3d at 1359-60 ("the specification acts as a dictionary when it contains definitions of terms"); *Digital Biometrics v. Indentix, Inc.*, 149 F.3d 1335, 1344 (Fed. Cir. 1998); *Vitronics*, 90 F.3d at 1582. Definitions of claim terms contained in the specification can be modified by statements made during prosecution of the patent before the Patent Office, thereby disclaiming during prosecution some claim scope. *Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319, 1327 (Fed. Cir. 2002) (stating that the Court was not persuaded by arguments that the patent specification definitions included the disputed term because "[r]eading the written description alone, this argument might be effective, but in light of the prosecution history, which was generated after the written description was drafted, it is apparent that Rheox relinquished any coverage of the disputed term."); *see also Spectrum Int'l*, 164 F.3d at 1379-80 (determining that the arguments made by Spectrum during prosecution disclaimed certain claim scope despite what was in the written description). For this prosecution disclaimer to be valid, the prosecution history must show clear and unmistakable surrender of subject matter for a court to determine that a potential claim construction has been relinquished. *See, e.g., Eagle Comtronics, Inc. v. Arrow Commc'n Labs., Inc.*, 305 F.3d 1303, 1316 (Fed. Cir. 2002) (internal citations omitted); *see also Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325-26 (Fed. Cir. 2003) (internal citations omitted); *Computer Docking Station Corp.*, 519 F.3d at 1375 (internal citations omitted); *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1288-89 (Fed. Cir. 2009) (internal citations omitted).

**in the form of a dietary supplement**." JX 8 at 2. (emphasis added). The Examiner further stated "upon search of the appropriate data bases [he] was unable to find any reference which would provide a basis for rejection under any of the appropriate patent laws or any of the Office's administrative directives." *Id*. Not only did the applicants use the term "human dietary supplement" to distinguish the claimed subject matter over the prior art, the Examiner considered the term to be a limitation and given the definition supported by the specification and set forth in the preliminary amendment, he was unable to find any reference on which to base a rejection.

The definition provided in the preliminary amendment filed during prosecution of the '381 patent is fully consistent with NAI's proposed construction in this litigation. NAI's proposed construction further clarifies the meaning set forth in the preliminary amendment. Specifically, the preliminary amendment stated that the term means "an addition to the human diet in a pill, capsule, tablet, powder or liquid form, which is not a natural or conventional food, and which effectively increases the function of tissues when consumed." JX 5 at 5. The preliminary amendment, however, also stated that the claims do not encompass meat, meat extract supplements and predigested meat/protein supplements and that to the extent any of the compositions alleged as prior art contain the individual amino acid beta-alanine "applicants respectfully submit that the definition of human dietary supplement set forth above does not encompass compositions such as those set forth by the Defendant in the Interrogatory Response." *Id*. at 6. The preliminary amendment, therefore, excluded meat and food flavoring and extracts from the definition of "human dietary supplement."

Additionally, the Examiner's Reasons for Allowance excluded meat and food flavorings and extracts and pharmaceutical compositions/products. JX 8 at 2 ("upon search of the appropriate data bases was unable to find any reference which would provide a basis for

rejection under any of the appropriate patent laws or any of the Office's administrative

directives."); *see also* JX 7 at 3 (the Examiner considered references 40, 41 and 43 that disclose

pharmaceutical compositions containing beta-alanine). The prosecution history, therefore,

demonstrates that pharmaceutical compositions/products, meat and food flavorings and extracts

are not encompassed by the definition set forth in the preliminary amendment and that the

Examiner, who is familiar with the knowledge of one of skill in the art, understood this. These

additional exclusions in NAI's proposed construction, therefore, merely clarify the definition of

"human dietary supplement" that was asserted during prosecution.

Likewise, adding the language "over a period of time," merely clarifies the meaning of

the term as set forth in the preliminary amendment and exemplified in the specification. The

preliminary amendment stated that the term "human dietary supplement" means "an addition to

the human diet in a pill, capsule, tablet, powder or liquid form, which is not a natural or

conventional food, and which **effectively increases the function of tissues when consumed**."

JX 5 at 5 (emphasis added). To "effectively increase the function of tissues when consumed" the

"human dietary supplements" of the claimed invention must be consumed over a period of time

and this is supported by the specification. As discussed above, the written description provides

support for the supplements to be consumed for periods of time ranging from about 3 days to at

least 4 weeks. See, e.g., JX 4 at col. 3, l. 67-col. 4, l. 3; Id. at col. 4, ll. 30-34.

Furthermore, the written description discloses multiple experiments in which the

supplements were given over a period of time. *See, e.g.*, JX 4 at col. 10, ll. 38-39; JX 3 at col. 6,

ll. 40-41; JX 4 at col. 10, ll. 61-62; JX 3 at col. 6, ll. 64-65; JX 4 at col. 15, ll. 47-51; JX 3 at col.

11, ll. 63-67; JX 4 at col. 10, ll. 56-61; JX 3 at col. 12, ll. 7-11; JX 4 at col. 16, ll. 30-35; JX 3 at

col. 12, ll. 60-65. In Example IV it is evident that to "effectively increase the function of tissues

when consumed" the supplements were administered for 14 days. JX 4 at col. 17, l. 41-col. 18, l. 11; JX 3 at col. 14, l. 38-col. 15, l. 9 (showing an increase in maximal voluntary contractile force of the knee extensors after 14 days of supplementation with beta-alanine). The addition of the language "over a period of time," is therefore, supported by the written description of the patents-in-suit and merely clarifies that which is evident from the written description and understood by one of skill in the art.

The written description and prosecution history demonstrate that the term "human dietary supplement" used in the preamble of claim 1 and the body of claim 13 is a claim limitation. Furthermore, the written description and prosecution history provide ample and specific support for NAI's proposed construction of the term. The Court, therefore, should construe the term "human dietary supplement" to mean "an addition to the human diet, ingested as a pill, capsule, tablet, powder or liquid, which is not a natural or conventional food, meat or food flavoring or extract, or pharmaceutical product and that increases the function of tissues when consumed over a period of time."

### B.   DNP Has Not Proposed Any Construction Of "Human Dietary Supplement."

DNP does not offer any proposed construction for this term. Rather DNP alleges that if this term is a limitation then it is indefinite. Such an argument is improper during claim construction and is more properly determined through expert testimony once the Court has construed the terms. *See, e.g., Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384 (1996). In addition, as shown above, the term is not indefinite – its meaning is amenable to construction

and it is not insolubly ambiguous.[8] Because DNP does not offer any construction for this term, the Court should adopt NAI's proposed construction.

## II.    EFFECTIVE IN DELAYING THE ONSET OF FATIGUE IN A HUMAN

| Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| effective in delaying the onset of fatigue in a human ('381 patent claim 13) | "requires the human dietary supplement to be present in a sufficient amount and to be consumed over a period of time such that it will delay the onset of fatigue." | Indefinite. |

### A.    NAI's Proposed Construction

The term "effective in delaying the onset of fatigue in a human" used in claim 13 "requires the human dietary supplement to be present in a sufficient amount and to be consumed over a period of time such that it will delay the onset of fatigue." The term "effective in delaying the onset of fatigue in a human" is in the body of claim 13 and refers to the "human dietary supplement," i.e., the "human dietary supplement" must be "effective in delaying the onset of fatigue in a human."

---

[8]    A claim is indefinite only when it is not amenable to construction or insolubly ambiguous. See, e.g., Exxon Research & Eng'g Co. v. United States, 265 F.3d 1371, 1375 (Fed. Cir. 2001) ("We have not insisted that claims be plain on their face in order to avoid condemnation for indefiniteness; rather, what we have asked is that the claims be amenable to construction, however difficult that task may be. If a claim is insolubly ambiguous, and no narrowing construction can properly be adopted, we have held the claim indefinite. If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds."); Biosig Instruments, Inc. v. Nautilus, Inc., 715 F.3d 891, 898-99 (Fed. Cir. 2013), cert. granted, 187 L. Ed. 2d 702 (2014) ("The disputed term 'spaced relationship' does not suffer from indefiniteness. Because the term was amenable to construction, indefiniteness here would require a showing that a person of ordinary skill would find 'spaced relationship' to be insolubly ambiguous – that it fails to provide sufficient clarity delineating the bounds of the claim to one skilled in the art. In this case, a skilled artisan would find such boundaries provided in the intrinsic evidence.").

While frequently only certain terms are in dispute, the meaning of these terms can be determined by considering the surrounding words of the claims. *See Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1299 (Fed. Cir. 2003). "Proper claim construction, however, demands interpretation of the entire claim in context, not a single element in isolation." *Hockerson-Halberstadt, Inc. v. Converse Inc.*, 183 F.3d 1369, 1374 (Fed. Cir. 1999). The words of the claims should be considered in conjunction with the specification, of which they are a part, in determining the proper meaning of terms. *Markman*, 52 F.3d at 978-79; *Vitronics*, 90 F.3d at 1582; *Phillips*, 415 F.3d at 1314. Here, considering the term in context with the surrounding words in the claim and the disclosure in the specification, the term requires that the human dietary supplement be present in a sufficient amount and to be consumed over a period of time such that it will delay the onset of fatigue.

Claim 13 of the '381 patent reads as follows: "The human dietary supplement of claim 1, wherein the human dietary supplement is effective in delaying the onset of fatigue in a human." JX 4 at col. 22, ll. 23-25. As discussed *supra* in relation to the term "human dietary supplement," the written description provides ample support that the supplement must be consumed over a period of time so that it will increase the function of a tissue. Claim 13 further requires that the "human dietary supplement" "effectively delay the onset of fatigue in a human." This is a separate and additional requirement to increasing the function of a tissue, but this also requires that the supplement be consumed over a period of time and in sufficient quantities, which is also supported by the written description.

Specifically, the written description states that useful supplements increase the function of tissues when consumed and that important supplements in the sporting and athletic community "improve athletic ability" and "promote or enhance physical prowess for leisure or

employment purposes." JX 4 at col. 1, ll. 40-52; JX 3 at col. 1, ll. 18-30. This improvement in athletic ability or enhancement of physical prowess can be delaying the onset of fatigue. Furthermore, the specification states that the methods and compositions of the claimed invention "can be used to increase beta-alanylhistidine dipeptides in sportsmen, athletes, body-builders, synchronized swimmers, soldiers, elderly people …, to avoid or delay the onset of fatigue." JX 4 at col. 7, ll. 5-9; JX 3 at col. 3, ll. 60-65.

Moreover, Example IV describes an experiment in which subjects were given beta-alanine for 14 days and their performance pre- and post-supplementation was assessed. Specifically, before the supplementation period began the subjects performed exercise at 66% of their maximum ability until they reached fatigue and this was repeated three times with a 60 second interval between each contraction. JX 4 at col. 16, l. 60-col. 17, l. 5; JX 3 at col. 13, ll. 24-39. The subjects were then supplemented with beta-alanine for 14 days. JX 4 at col. 17, ll. 8-17; JX 3 at col. 13, l. 42-col. 14, l. 9. On day 14, the subjects repeated the endurance test to determine if there was any change relative to endurance before the beginning of the study. JX 4 at col. 17, ll. 18-21; JX 3 at col. 14, ll. 10-13. The results indicate that the mean endurance time increased in nearly all the subjects, *i.e.*, 14 days of supplementation with beta-alanine at 10 milligrams per kilogram body weight three times per day delayed the onset of fatigue. JX 4 at col. 17, ll. 41-47; JX 3 at col. 14, ll. 37-44. To be "effective in delaying the onset of fatigue in a human" the "human dietary supplement" must therefore, be present in sufficient quantities and be administered over a period of time. The Court should construe the term "effective in delaying the onset of fatigue in a human" as set forth in NAI's proposed construction in the Joint Claim Chart to be "requires the human dietary supplement to be present in a sufficient amount and to be consumed over a period of time such that it will delay the onset of fatigue."

**B.**   **DNP Has Not Proposed Any Construction For The Term "Effective In Delaying The Onset Of Fatigue In A Human."**

DNP does not offer any proposed construction for this term. Rather DNP alleges that if this term is a limitation then it is indefinite. As discussed in section I.B, such an argument is improper during claim construction and the term is not indefinite as it is amenable to construction and is not insolubly ambiguous. DNP does not offer any construction for this term and the Court should adopt NAI's proposed construction.

## CONCLUSION

For the forgoing reasons, NAI respectfully asks this Court to adopt NAI's proposed constructions.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Richard J. Oparil                         By:  */s/ Richard L. Horwitz*
Scott A.M. Chambers, Ph.D.                      Richard L. Horwitz (#2246)
Kevin M. Bell                                   David E. Moore (#3983)
Lacy Kolo, Ph.D.                                Hercules Plaza, 6th Floor
PATTON BOGGS LLP                                1313 N. Market Street
2550 M Street, NW                               Wilmington, DE  19801
Washington, DC 20037                            Tel:  (302) 984-6000
Tel:  (202) 457-6000                            rhorwitz@potteranderson.com
                                                dmoore@potteranderson.com

Caroline Cook Maxwell
PATTON BOGGS LLP                          *Attorneys for Plaintiffs Natural Alternatives*
2000 McKinney Avenue                      *International, Inc. and Compound Solutions, Inc.*
Suite 1700
Dallas, TX 75201
Tel:  (214) 758-1500

Dated:  February 7, 2014
1138725 / 34341

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, Richard L. Horwitz, hereby certify that on February 7, 2014, the attached document was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

I hereby certify that on February 7, 2014, the attached document was electronically mailed to the following person(s):

Karen E. Keller
Andrew E. Russell
Shaw Keller LLP
300 Delaware Avenue, Suite 1120
Wilmington, DE 19801
kkeller@shawkeller.com
arussell@shawkeller.com
*Attorneys for DNP International Co., Inc.*

Enoch H. Liang
Steven R. Hansen
Edward S. Quon
Lee Tran & Liang APLC
601 S. Figueroa Street, Suite 4025
Los Angeles, CA 90017
enoch.liang@ltlattorneys.com
steven.hansen@ltlattorneys.com
edward.quon@ltlattorneys.com
*Attorneys for DNP International Co., Inc.*

/s/ Richard L. Horwitz
Richard L. Horwitz
David E. Moore
Bindu A. Palapura
POTTER ANDERSON & CORROON LLP
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com
bpalapura@potteranderson.com

947955/34341